This is consolidated case 1240220, and it's Cynthia Kroft and Mark Kroft v. Viper Trans, Inc. and P. R. Renolink, Frederick Rasduski, Appellant Defendants. You have before you the panel of Aurelia Puchinsky, James Fitzgerald-Smith, and Terence Lavin. Our normal procedure is that the appellant will start, get approximately 15 minutes to put on their case. In this case, there's a couple of changes that I'm going to make. Well, let me finish what I was saying, and then we'll ask questions after the appellant has put on whatever they're putting on, and then the appellee will get the same opportunity, and then the closing. We don't feel that there's too much need to go into the jurisdiction because the case is here, so it's beyond that point. It's not going to change. And secondly, as to the fees, they're set and the case law hasn't changed, so I wouldn't waste your time on that. So, the key is you want to talk about the ethical situation of this case and what it means to the clients. So, with that in mind, I would ask the appellant to proceed. Well, no, I'm going to read something first. I'm going to read to you Section R3.6A of the L&A Rules of Professional Conduct as of January 2010. And it states, a lawyer who is participating in the litigation of a matter shall not make a extrajudicial statement that the law knows or reasonably should know will be disseminated by means of public communication and would pose a serious and imminent threat to the fairness of an adjudicator. So, you've got two ethical situations. You've got an extrajudicial statement that a lawyer made or reasonably should know will be disseminated. So, you've got two potential ethic violations in this case, and we want to hear from both sides what they think, especially the appellant. You may proceed. Your Honor, we might have a problem. This is Hugh Griffin. I'm for some of the defendant appellants. Mr. Tim Eaton has a viper, and we had agreed that he was going to make the argument. I don't see him. I see him. Hi, Justice. Hi, Hugh. Hello. This is John Amarillo with Taft. We're here, but it appears that the court turned off our camera. Darren, can you check that? Darren. There he is. He is seen. There's my lawyer. Thank you. So, we're all present and accounted for now? Yes, Your Honor. My name is Tim Eaton, and I think, as Mr. Griffin just indicated, I intend to make the argument for all of the defendants because we're really raising the same issues, and we didn't want to repeat one another and duplicate the arguments. And then I believe, consistent with what you just said, Justice Smith, we will not address the prejudgment interest because you all have heard about that any number of times, have issued opinions on that any number of times. So, unless you have questions for us on that issue, we'll stick with the agenda of addressing the ethical issues as well as one or two other issues that we wish to address. All right. So, let me begin by saying, particularly on following up on your reference to 3.6A, we believe that Mr. Allen's misconduct in posting on his website and in social media facts, opinions, and misinformation that were intentionally and properly withheld from the jury was an assault on the integrity of this trial, the trial system, as well as the fair administration of justice. In our opinion, it was an effort to undermine the adjudicative system, and the assault on our judicial process must be answered by this court by ordering a new trial, in our opinion. Let me just say at the outset, before I get into the merits, I realize that the delay that this will be caused by a new trial to the cross is unfortunate. However, the blame for that delay lays squarely at her counsel's feet. Apparently, Mr. Allen did not learn anything from Judge Flannery's finding in the first trial that his misconduct in the first trial was premeditated and denied defendants a fair trial. In fact, in the second trial, he doubled down and went outside of the courtroom process to prejudice the jury. It's this court's duty to protect our judicial system against threats like that posed by his conduct. Judges must strive to maintain and enhance confidence in the legal system. Plaintiff argues that this case simply focuses on the age-old question of whether the jury was exposed to extraneous information. But this is not true. The focus, in our opinion, should be on the plaintiff counsel's intentional conduct to expose the jury to highly inflammatory extraneous information that a jury should not know. Mr. Allen's blog was intentionally titled, What Jurors Should Know But Don't. That title would catch any jurors' attention. In the blog, he discussed the hard work that the first jury put into the case and commented it was sad that Judge Flannery rejected that work. He later asked whether the second jury should be told about the new trial taking so long, and he said, why not? But he failed to mention that it was his misconduct that caused Judge Flannery to order a new trial. He then attempted in his communication to set a floor for damages in the retrial of $43 million previously awarded, which he said doesn't come close to making up for the grievous economic harms caused by defendants' inexcusable negligence. And I don't need to remind the court, but I will at times, that this is a damages-only trial. So our inexcusable negligence, which he referred to, is totally irrelevant to the damages-only trial aspect. He then specifically mentioned insurance, saying that jurors never learn about deductions from Medicare, Medicaid, private health insurance, and other medical expenses. He also added that from one-third to one-half of what jurors awarded was taken out of the plaintiff's share of the verdict before receiving any money, and a prior settlement is deducted from the verdict, which is particularly relevant because that's exactly what happened in this particular case. All these observations related to the blog and related to damages that the plaintiff received in this case, it was clearly premeditated. In fact, his conduct was more extreme than his conduct in the first trial. In our opinion, the timing of the post, which was on the very day of the beginning of the trial, and was over eight months after Judge Flannery's ruling on the new trial, was no coincidence. He knew that there would be some period of time before the jury was admonished not to do any research or investigation, and he posted it on that day. So the post was the first thing a potential juror would have seen when visiting his firm's website and social media pages. Several potential jurors said they knew who Mr. Allen was from his TV commercials. They also saw his calling card, his fedora, prominently displayed on his briefcase handle during the trial, and there's a reference in the record to that being the case. And before they were admonished not to do so, they may well have visited his website or the social media pages. In our opinion, this certainly was the intent of the timing of the blog. Plaintiffs argue in their brief that the intent of the blog was entirely a red herring. No, it isn't. It goes to the core of the judicial integrity of our trial process. Mr. Allen's blog was a premeditated act to prejudice this jury. When confronted with the blog during the trial, he even denied knowing about the post, even though they contained quotes from him directly, and the post itself said it was written by Mr. Allen. If I could ask plaintiffs' counsel questions, I would want to know, why did the blog specifically reference the cross case by name and case number unless it was intended to reach this jury? Why did it reference Judge Flannery's ruling over eight months after he ordered a new trial and the eve of a new trial? Why does most of the blog relate to issues only dealing with the calculation of damages, the only issue in the trial? Why does it mention the amount of the verdict in the first trial? Why does it say how much more in damage is the jury sure to award in the second trial? And why was it posted at the beginning of the second trial? To be honest, we believe this is a case of first impression in this state. This is not a case, though, where the jury had inadvertently relied upon extraneous information such as a dictionary or something they read in the newspaper written by a third-party journalist. This is a case where one of the lawyers who had full control over the content and timing of the extraneous information that the jury received. Most of this information was not a matter of public record. And this case involves attempted jury tampering. That is serious. One case that we highlight in our brief, the Cartagena case, the exact same thing happened. The court was confronted with a situation where counsel for the plaintiff had put something on TikTok and Instagram discussing the specific facts of the case. One of the posts was published during jury selection and informed the jury that defendants usually have insurance coverage and that information related to the defendant's prior criminal conviction or the fact that they had agreed to a settlement are not allowed into evidence. That court ordered a new trial, even though the jurors were asked during jury selection whether they were even familiar with the plaintiff's attorney and they all denied such knowledge. But the Cartagena judge found that she was tasked with strictly protecting the integrity of the judicial process as well as principles of equity and justice. And she found that the social media posts were not simply plaintiff's counsel's informed expression about legal proceedings in general, but the plaintiff's lawyer's comments were in direct violation of 3.6 of the Code of Professional Conduct relating to extrajudicial communications and a new trial was required. Justice Smith, you referred again to 3.6A. We're not arguing that a violation of that rule in and of itself requires a new trial, but that rule should make it clear and eliminate any possible doubt as to whether the character of Mr. Allen's misconduct constituted a threat to the fairness of the trial and integrity of our judicial system. Why else would we have those rules? Mr. Eaton, just a quick there. It's actually, isn't it a double ethical violation? Whether the effect was that it probably got to the jurors or it put a presumption on us to review what nobody should have to review. So that's one ethical violation. The other one is if, in fact, it did get to the jurors, that cements that the case has to go back. Yes, yes, as to both observations, Your Honor. So, to be clear, if it didn't get to the jury, and we're not saying it didn't, we're saying there's enough circumstantial evidence to indicate that it did, but even if it didn't, we're saying that this is a direct attack on the integrity of the judicial process and it's part of the process that would require a new trial. That's okay. What you had just said beforehand was that the blogging or whatever, the post that was prejudiced the jury, and there's no direct testimony here that any single one of the 12 had actually read the information. Is that correct? It is correct, Your Honor, but we do cite the circumstantial evidence with respect to that fact. Number one, there was evidence at the trial where one of the jurors commenting to another jury during a break had used the word retrial. And the judge did vadir the jury on whether they had heard anything extraneous, and they said no. There was a second reference by the plaintiff's lawyer himself in his rebuttal closing arguments where he referred to $43 million would be reasonable 13 months ago, but it's not now because of this new injury. That number is not grounded anywhere except in the blog itself. The jury never heard the $43 million number previously. There was also an indication that. The admonition may not have been enough for them to come forward with information. I know I'm probably trampling on sacred ground myself when judges come up with admonition. But in this case, by the time that admonition, or excuse me, that vadir occurred after this blog came to light, they'd been warned twice about being held in contempt. If they violated that, they were told by the judge that she was relieved that no one had, that they were told to report it to her, and they didn't, so she assumed that they didn't. These were going through the jurors mind, so we think if you look at the admonition carefully as well, that's not something that would indicate that they hadn't seen it. So, these are purposes of excuse me. These are evidence that we believe that the jury had some knowledge of that blog. Do we have someone saying? Yes, I read it like, in some of the other cases. No. But what we do have is, again, this assault on the judicial process, which we believe in and of itself should be enough to warrant a new trial. All we're seeking is a fair trial to determine reasonable damages. And this process of doing so should not have been attacked through a blog intended to reach the jury. The posting of the blog on the very day it did indicates that there was an intent to get this information from the jury. These are direct quotes. Let me ask you, regardless of whether the plaintiff attorneys were successful in reaching the jury. One, you already said the intent was there. But also the effort to do so are clearly present in the case. So, that answers I think Judge Levin's thing, the effort to do so was clear, just by the fact there was a blog. Yeah, but if that's the case, is this just an ethical issue for a different body as opposed to? No, I think it's sufficient for us to send the case back. I know you, I'm just asking Mr. Eaton. I almost feel like I'm becoming, never mind. I like this answer, Justice Levin, but let me elaborate on that. So, it's often the case that there can be both a disciplinary proceeding and a trial if something occurred where there's been a violation of a disciplinary rule, which had an impact on whether there was a fair trial. For example, if someone were going to be bribing the juror and they were caught, well, that doesn't mean that's a disciplinary issue only. That would go directly to whether or not there was a fair trial. So, both could proceed. He could be disciplined and he could also lose the trial because of his conduct. So, it doesn't have to be either or, it can be both. Mr. Eaton, I'm going to take it that you're also not happy with the way the judge tried to cure this by asking everybody all together. Hey, did anybody see any of this stuff? You're correct. I'm not. You know, it's always easy to second guess someone who's in the heat of the moment. But I think what would have been better, and we had suggested this the day before when there was another motion for mistrial, when the word retrial came up. We suggested that perhaps she talked to each juror individually because it's difficult after you sat with the jury for four or five days and you've heard all this evidence. And now you're told to raise your hand, which may result in a mistrial, may result in contempt. In fact, one of the reasons why we suggested they not even flagged the jury was we thought it would be unfair to the jury, who had been threatened twice now with contempt, to go ahead without having their own counsel. That was one of the reasons. The second reason was we were afraid if we point out that there's this blog out there and they haven't yet deliberated on damages, they may go look for it. That was another fear. So, we didn't think on the second time this came up, there should be even any type of idea that there should be simply just a mistrial declared. I thought there was a procedure in effect in the law division that you had to individually take the jurors back, but maybe that's no longer the case. It might be with respect to a verdict. Was this then? And is this now your verdict? No, this is when you pick the jury. Okay, after something like that, but whatever. Go ahead. Mr. So, I want to get to, I think when answering Justice Lavin's question earlier, I did talk about why we thought there was some evidence that it did get to the jury. And at that point, the burden shifts to show prejudice on the part of who had the offending blog, in this case, the plaintiffs. We think we have enough indications that this may well have happened. And by the way, I did want to stress one point, too. They said, and this goes to the issue of whether they actually saw the information. It doesn't go to the attack on the integrity of the process. But they repeatedly cite in their brief, I think six times, that the blog wasn't posted until the jurors had been admonished not to go investigate. There's no basis in this record for that whatsoever. The judge thought at one point that, well, gosh, some of the jurors who hadn't even been picked may have quickly gone to Mr. Allen's website because they saw his hat and they knew his name. And maybe they saw it then. They hadn't even been sworn in yet. But once they were sworn in, it was like two or three in the afternoon. And all we know is the blog was posted on July 7th, the first day of trial. Why, up until this point, has Mr. Allen's office not said when it was posted? They've been challenged on that issue repeatedly, and they've never said when it was posted. They said, well, it was after the admonition because that's what the judge said at one point. And we had said, oh, yeah, that's correct. She didn't know. We didn't know. They know. And yet it's still silent. So that was another point I wanted to make on whether or not there should be a new trial. I was going to also address the issue of the closing arguments, but I don't know how much time I have left or whether the court wants me to or if you have more questions on the blog issue. I'd move on beyond that if I were you. Okay, thank you. So with respect to was there enough prejudice here based on the blog to warrant a new trial if we're getting into actual prejudice, and we would argue that, yes, there is, based on the closing arguments. So in the closing arguments, there had been before the, excuse me, the closing arguments there, of course, of emotions and liminy, one of which was raised because it occurred in the first trial, was improper shifting of the burden from the plaintiff to the defendant, such as arguing, well, the defendants failed to produce better evidence in this jury on several issues. That was objected to. That was sustained. But the seed had been planted. There was also an error referring to the defendant's conduct of stealing Cindy's Cross Most Valuable Asset, her human right to be free of pain. Again, this is a trial on damages only. It was defendant's conduct was not an issue, and this was also subject to emotional liminy that had been granted. Mr. Allen also crossed the line in closing arguments by telling the jury that their decision would affect us all and affect our community, and the verdict that you reach will resonate loudly. This was not a liability case. Reaching one damage verdict versus another will not send a message. Finally, Mr. Allen violated emotional liminy by arguing to the jury without any factual support that the defense counsel were unethically trying to hide evidence by supposedly asking their expert accountants to ignore plans devised by the plaintiff's expert and not giving the present cash value to it. This was one of the major reasons in the first trial that Judge Flannery ordered a new trial because of the prejudice. Your Honor, frankly, we have a situation here where there's a very good plaintiff. It's a damages only case. Why would you go there on issues of liability? Why would you go there on calling us thieves and misleading the jury when, in fact, that was the basis for ordering the second trial? It just doesn't make any sense. And we would also argue that the cumulative effect of these statements during the closing argument, which were very prejudicial in this damages only trial, warrants a new trial. And at the moment, that's all I have to say. I'm happy to answer any other questions. Thank you. Any questions? No, not for me. Okay, the appellee may proceed. Thank you. Thank you, Your Honor. May it please the court. My name is Sarah, and I am one of the attorneys representing Cynthia and Mark Croft in this appeal. I will address defendant's speculative and unsubstantiated claims of harm from an unread blog post in a moment. But first, let me let me tell you a little bit about the story. How do you know it was unread? We know it was unread, Your Honor, because it was posted, as has been discussed, once the jury was sworn and selected and instructed by the trial court. And once the issue of the blog or the presence of the blog came to light after defendants had discovered it in the middle of trial, the trial court asked the jury about it. She was very conscientious. Do you buy the judge's presentation of that? Don't you think that judge was way out of line, that she didn't do her job? She should have called every juror in individually. You can't take a body of jurors and expect them to rationally not kind of waver and fear what the other one's going to say or do. I disagree. I think what she did was... Well, we know you disagree, so just move on. I think what she did and how she handled the issue of the blog arising was the proper and appropriate course to take. We have to presume under the longstanding law in Illinois that jurors follow the trial court's instructions. And you know that that spunk. If that's untrue and if that's not a presumption that we can rely on, then the entire jury trial system crumbles. We have to presume that... Well, it depends on what attorneys you got before you. Regardless of what attorneys you have before you, I think we have to maintain the jury trial system. And in order to do that, we have to presume that jurors are going to tell the truth and that they're going to follow the law and the instructions given to them by the trial court. Because if we don't do that, and if we assume that they're not going to do that, then our entire jury trial system as we know it disappears. That kind of conflicts with your blog. You're actually saying, well, we put a blog out, so we presume the jurors won't pay any attention. They'll find it because of the way you wrote it up with the name of the case, the number of the case, all of this. And you say, oh, the jurors will follow the law. The jurors in this case and in this trial did follow the law. They followed the trial court's instructions. The trial court was in the best position to ensure the integrity and the fairness of the trial. And in doing so, she was able upon her inquiry with the jury to observe their body language, their facial expressions and mannerisms in response to her inquiry. And she determined and important here is that this is an abuse of discretion standard. So with all of her observations, she determined well within her discretion that the jurors had followed her instructions and had not been exposed to the blog post. I think that is the key point is we have to look at the standard of review is to determine that the judge was abusing her discretion when she didn't conduct this examination in a different way. Right, your honor, an abuse of discretion is the standard and meaning it was the trial court unreasonable and clearly abused her discretion. It's not whether trial court's judgment can be substitute substituted for another or whether reasonable minds may differ as to how it was handled or the end result that was reached. But whether the trial court here observing the entire trial, the course of proceedings, the arguments, the witnesses, the evidence, the jury throughout the entire trial, whether in her, it was well within her discretion after her inquiry with the jury. To determine that they had followed her instructions and had not been exposed to the blog. Thank you. So, I will continue and make the rest of our arguments, of course, with with related to the blog posts in a moment. I did want to briefly give you background on the crop story and why we are here because the crops lives at the central point of this entire case, this entire trial, their lives were forever changed on May 11, 2016. When defendant semi tractor trailer disregarded a red traffic signal on the highway and slammed into the back. We don't need to go into that. We read it. Just stick with the ethical violations. That's the center issue of this case. Everything else we said is is settled in our minds. Understood your honor. However, the, the ethical issue. If you, if we are focusing on rule 3.6 and the ethical issue, the analysis must not be the conduct. In isolation, it must be whether any potential violation, which we don't think there was whether any potential violation of any ethical rule. Resulted in an effect on the jury that resulted in an unfair trial, the defendants asked this court to ignore the entire analysis that is ingrained in Illinois law regarding exposure to extraneous information. And because your honor would like to hear more about about their argument, I will address address that 1st. They can test that this blog was so presumptively prejudicial that it automatically entitles them to a new trial based on the mere existence of the blog on the Internet alone. But that's like saying that liability can exist because of the reprehensible conduct of a defendant, even if that conduct doesn't proximately cause any harm. Of course, that's not the law. There must be a causal connection and here the trial court was in the best position to assess the effect. If any, that the blog had on the judicial process, and on this trial, and on this jury, and because the trial court found there was no causal connection between the blog and the verdict. It was not air to deny a new trial. The defendant's position in this regard has no support in Illinois law, and they instead resort to the trial court order out of the state of Georgia, Carta, Hanna versus Medford, which which they mentioned. But that trial courts order is entirely it lacks any precedential value, but it also lacks any persuasive value. And maybe the most dispositive distinguishing factor relates to when the trial court in Carta Hanna first was advised of the existence of these three social media blogs. In that case, it at least appears from the content of that trial courts order that the trial court was not advised of the existence of the social media blogs until after the jury returned its verdict was discharged. And the post trial motion was filed. That was the first mention of these social media blogs, according to that trial courts order was with the post trial motion. So that means in Carta Hanna, the trial court never had an opportunity to question the jurors and assess the impact of these social media blogs on the jurors and on the trial during the course of the trial. Of course, we know that that's not the case here. Here, the trial court had every opportunity to and did address the jury about the blog, assess the credibility of their responses, and concluded well within her discretion that they had followed her instructions, had not seen the blog, and ensured the fairness of the trial going forward, despite the existence of the blog on the vast Internet alone. I don't think it can be said that the trial court in Carta Hanna would have reached the same result that it did had it been given that same opportunity to address the jury during the course of the trial and actually be able to determine what impact, if any, those social media blogs had. And additionally, this case is far more similar, in our opinion, to the Grant versus Serber case, which is cited in our brief. This was a Texas Court of Appeals case where the plaintiff's counsel published an editorial letter on the third day of trial that was critical of the medical malpractice law of the state of Texas, and this was during a medical malpractice trial. That editorial included criticizing physicians for failing to come forward and testify honestly in medical malpractice cases and discussed how these medical malpractice cases often result in death, as did the case that was currently being tried. In that case, the defendant moved for a mistrial, which was denied, and then moved for a new trial, which was also denied. Then, on appeal, the defendants argued, much like the defendants do here, that this editorial had such a potential for prejudice that its existence alone warranted a new trial. But the Court of Appeals there said, no, the bare existence of this editorial in the newspaper was insufficient to establish prima facie harm. There was no evidence in that case, like here, that the jury was exposed to the editorial, so it was not an abuse of discretion to deny the motion for new trial on that basis. And that's precisely what we have here. This is much more a situation that presents the basic question of whether extraneous information reached the jury and influenced the verdict. And under the well-established analysis in Illinois, the defendants have the threshold burden of first proving that such information actually reached the jury. And they failed to meet that burden here. And as I've discussed already, the record shows that the opposite is true. After the jury was selected and sworn, the trial court instructed them specifically to refrain from any investigation or research into the case, the parties, or the counsel involved. And Illinois law could not be more clear that jurors are presumed to follow the instructions of the trial court and the law as given to them by the trial court. And as I've already said, this is the very cornerstone of our jury system. And if we ignore it, as the defendants suggest we should, our entire jury trial system crumbles. The jury's exposure to the blog in this case comes down to this foundational principle ingrained in Illinois law that jurors are presumed to follow the trial court's instructions. And here we don't just have this presumption to rely on. The record proves that the jurors acted consistent with this presumption. Because once the blog was discovered by the defendants, the prudent thing to do and what the trial court did was to ask the jury about it in a general way so as to not tip them off to go searching for something at the end of the day. In doing so, the trial court was able to assess the responses of the jurors to its inquiry and make that determination after its firsthand observations of the jury's conduct to conclude that they had followed her instructions and had not been exposed to the blog post. This was an appropriate exercise of the trial court's discretion. The defendants' assumptions that the jurors disobeyed the trial court's instructions and then committed perjury, lying to the trial court about it, and then continued to disobey the trial court's instructions by considering the blog somehow in their deliberations is not supported by the record and is contrary to Illinois law. No matter its content or its intent, an unread blog post poses no harm. Even if we do assume that the jury did see the blog, which defendants have failed to establish in our opinion and which the record refutes, the analysis doesn't end there automatically entitling defendants to a new trial. The burden simply shifts to the Crofts to demonstrate the absence of any prejudice, and the Crofts have made that showing here. The largely uncontroverted evidence at trial affirmatively demonstrates that the verdicts were fair and reasonable, were based on the evidence, and were not the result of any passion or prejudice. Significantly, defendants don't even contend that the verdicts were excessive or not based on the evidence, nor could they considering the Crofts' devastating and life-altering injuries and damages that were proven by the evidence in this case. Are you done? Yes, Your Honor. If I could just make one more point. If the jury had seen the blog and was influenced by it, the verdict would have been exponentially higher. The blog post discussed Cindy alone. It did not discuss or mention Mark at all, and it suggested a verdict of $100 million. The verdict from the jury in this case was less than half that, and was actually less than the $43 million that was mentioned in the blog as well. If you have any more questions, Your Honor, I understand you wanted me to wrap it up, but I'm happy to answer any additional questions you may have. Any questions? I'm good. Mr. Eaton, you may proceed. Your Honors, I find it ironic that counsel would talk about the jury system crumbling, if you follow our point of view, when, in fact, there's clear evidence that they tried to tamper with the jury through that blog. She says, well, but it didn't happen, so everything's good. So, apparently, in this jurisdiction, if you attempt to tamper with the jury and you're unsuccessful, you're off the hook. That's it, without proving prejudice. I don't buy that. That's not the system that all of us have grown up with. If you tamper with the jury, there should be consequences. Just because you throw a punch and don't land, it doesn't mean that there's no prejudice to the system. So, I wanted to point that out, first and foremost. Secondly, with respect to case law, our co-defendants actually cited two cases in addition to the Cartagena, the People v. Bowen case out of Louisiana and People v. Hensley. And I've done enough oral arguments to know the courts don't appreciate reading quotes, but since I can't say it any better than what the court did in the Bowen case, where, in fact, they did find, without finding prejudice, that a new trial should be warranted because it was an attack on the system. This is what they said. Faith in the courts and in the jury system must be maintained, and it is proper that on questions such as we have here, where there have been outside influences from the U.S. Attorney, should be such a support the faith of all litigants in our judicial system. The faith can be sustained only by keeping our judicial proceedings free from the suspicion of wrong. The question is not whether any actual wrong resulted, but whether there was created a condition from which prejudice might arise or from which the general public would suspect that the jury might be influenced to reach a verdict on the ground of bias or prejudice. And I can't make that argument any better than was made in that court. There was an attempt to jury, to tamper with this jury. She doesn't deny it. She just said, oh, well, they didn't read it. And so, therefore, the jury says it's going to crumble if you follow what I'm asking this court to do. I don't think that's true with respect to prejudice. Again, we've come forward with what we think is circumstantial evidence, including the similarity in verdicts. 60 to 70 percent of both verdicts were non-economic damages. It doesn't make any sense to me to say that they didn't have some inkling as to what was going on when they come up with the same amount of non-economic damages. Now, I realize that that, in and of itself, may not be enough. But when you talk about jurors talking about the word retrial, which was in the blog, when you talk about, I think, inadequate laudere done to a group, I think there's enough identification here. But that's not the only thing we have to ask for a new trial. We have the integrity of the judicial process, and we have the closing arguments which she did not address. So, for those reasons, we would respectfully ask that this court order a new trial so there can be a fair trial to determine the reasonable damages that the plaintiffs are entitled to. We're not arguing that they're not entitled to anything. But what we are saying is that there was a range of damages that our experts came forward with, a range of damages that the plaintiffs' experts came forward with, and this jury had to make a choice. And when this jury was influenced by the closing arguments, I don't see how they don't look at that choice in a negative way. And that's exactly what Judge Flannery found in the first trial, and he doubled down and did the same thing in this trial. So, respectfully, we ask that this court order a new trial. Thank you. Questions? I do have a question. Ms. Drayton, this whole case has seemed to me a sort of one-word case, and that one word is or, found in Rule 3.6, Principle A. Extrajudicial statement that the lawyer knows or reasonably should know. That word or, to me, connects everything that you've been saying as opposed to everything that Ms. Cafiero has been saying. She's been saying, well, they didn't hear it, they didn't see it, they said they didn't see it, they said they didn't read it. But that word or holds the attorney accountable for what he reasonably should know will be disseminated by means of communication and would pose a serious problem to the fairness of the system. So this, to me, is a one-word case. That or in there connects it all together for me. You're absolutely right, Judge Sputinski. It does not, again, if you throw a punch, it doesn't have to land. It's the fact that you're throwing, it's the fact that you're trying to tamper with the jury, and you know it could reach them. It's on his website. It was posted at a time, we don't know the exact time, she keeps saying after the admonition, we don't know that. But they certainly could have seen it. And I would sum it up, as you did with the word or, I think it's a clear violation of that rule and results in an unfair trial. Thank you. No further questions? Nope, good. All right, thank you both for your presentation. It was unique. I have to say in my 30 years as a judge, I never seen a case like this. But we've seen it now. We don't know what will happen to it, but I know where I'm going. So thank you both for your presentations. Thank you.